UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

DAVID S. MONTGOMERY,                    )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        No.  2:10CV39 TIA
                                        )
MICHAEL ASTRUE, Commissioner            )
of Social Security,                     )
                                        )
                    Defendant.          )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act.  Claimant has filed a

Brief in Support of his Complaint; the Commissioner has filed a Brief in Support of his Answer.

The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.      Procedural History**

On July 18, 2006, Claimant filed an Applications for Disability Insurance Benefits under

Title II of the Social Security Act (Tr. 57-62) and Supplemental Security Income payments

pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq. (Tr. 63-76)[1] alleging

disability since April 1, 2006 due to bipolar disorder.  (Tr. 82).  The applications were denied (Tr.

39-43), and Claimant subsequently requested a hearing before an Administrative Law Judge

_____

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 13/filed September 28, 2010) and the supplemental record filed on January 4, 2011
(Docket No. 20/filed January 4, 2011).

("ALJ"). (Tr. 46).  On October 7, 2008, a hearing was held before an ALJ.  (Tr. 19-34).

Claimant testified and was represented by counsel.  (Id. at 30-53).  Vocational Expert John

McGowan also testified at the hearing.  (Tr. 30-33).  In a decision dated October 27, 2008, the

ALJ found that Claimant had not been under a disability as defined by the Social Security Act.

(Tr. 6-18).  After considering the medical records in support, the Appeals Council denied

Claimant's Request for Review on May 20, 2010.  (Tr. 1-5; 207-246).  Thus, the ALJ's decision

is the final decision of the Commissioner.

II.      **Evidence Before the ALJ**

         **A.  Hearing on October 7, 2008**

                 **1.  Claimant's Testimony**

         At the hearing on October 7, 2008, Claimant testified in response to questions posed by

the ALJ and counsel.  (Tr. 19-29).  Claimant testified that he is thirty-five years old.  (Tr. 21).

Claimant completed the eighth grade and received his GED.  Claimant left school after the eighth

grade due to behavioral and disciplinary problems.  (Tr. 21).  Claimant testified that he drives now

that his license had been restored a year earlier.  (Tr. 24).

         Claimant worked at Monroe County nursing home as a nurse's aide for a few months.

(Tr. 22).  Claimant also worked at Pizza Hut, Roundtable Pizza, and Subway.  Claimant prepared

food.  Claimant worked for his father's company, a liquid propane gas company, before his father

sold the company.  Claimant testified that his father was very tolerant in allowing him to take days

off from work and to work for the company.  (Tr. 22).  Claimant performed basic labor work like

throwing wrenches and helping pipe.  (Tr. 23).  The ALJ noted that Claimant made decent money

from 1999-2001.  (Tr. 22).

Dr. John Hall treated Claimant at Arthur Center until he moved.  (Tr. 23).  Dr. Wilburs and Dr. Slaughter treated Claimant.  (Tr. 24).  Claimant testified that he has been diagnosed as a self-medicator at age thirty.  (Tr. 24).  Claimant has problems remembering to take his medications and his personal needs.  (Tr. 26).  Claimant can complete small tasks but if the task requires a combination of things, he would forget to do something.  (Tr. 27).  Claimant testified that his irritability used to result in violence, but he has learned to calm down.  (Tr. 27).  Claimant used to have problems with racing thoughts.  (Tr. 28).  Claimant testified that he can focus on art and sit down and draw for days on end without eating or resting.  (Tr. 28).  Claimant stays in bed pretty much all of the time and spends ninety percent of the time in his room.  (Tr. 29).  Claimant has a nervous twitch.  (Tr. 29).

Claimant testified he last consumed alcohol in the amount of a couple of beers in the last month.  (Tr. 25).  Claimant did not recall the last time he smoked marijuana.  (Tr. 25).

Claimant's psychological problems include confusion and problems with anger and judgment.  (Tr. 25).  Claimant has problems getting along with people, being under pressure, and remembering things.  (Tr. 26).  Claimant also has problems with concentration.  (Tr. 26).  Claimant testified that he moved back home because he needed help.  (Tr. 27).  Claimant had a choice of going to the hospital or moving back with his parents.  (Tr. 27).

### 2. Testimony of Vocational Expert

Vocational Expert John McGowan, a vocational consultant, testified in response to the ALJ's questions.  (Tr. 30-34).  Mr. McGowan listened to the testimony during the hearing and reviewed the vocational evidence in the file. (Tr. 30).

The ALJ asked Mr. McGowan to assume the following:

- 3 -

> [A] hypothetical claimant, age 32, with the alleged date of onset, with a GED, some past work experience as Mr. Montgomery.  There are not physical restrictions.... [C]laimant is able to understand, remember. and carry out as least simple instructions and non-detailed tasks; can respond appropriately to supervisors and co-workers in a task oriented setting, where contact with others is casual and infrequent.  Can adapt to routine, simple work changes, and can take appropriate precautions to avoid hazards.  Given those restrictions and those alone, could this hypothetical claimant return to any past relevant work?

(Tr. 30).  Mr. McGowan opined that "on the basis of the income where he was SGA level and above in '99, '00, '01, '05 and '06, and that family-owned liquid gas company working primarily as a laborer, the answer is yes."  (Tr. 30-31).  Mr. McGowan indicated that he assumed Claimant's work history to be kind of bad and noted confusion with the difference between his testimony and his income..  (Tr. 31).   Mr. McGowan noted that Claimant's work history included being a busboy on and off in 1989 and 2001, at the SGA level.  Mr. McGowan noted that Claimant is physically able to do food prep under the general heading of fast-food worker as long as he was not dealing with the public.  (Tr. 31).

Next, the ALJ asked Mr. McGowan to accept the restrictions in the RFC prepared by Dr. Finder and whether the hypothetical claimant would be able to return to any past relevant work.  (Tr. 32).  Mr. McGowan responded no and that such claimant would not be able to perform any full-time competitive work in the national economy.  Mr. McGowan opined that his testimony had been consistent with the DOT and the Selected Characteristics of Occupations.  (Tr. 32).

Counsel asked Mr. McGowan to assume the following:

> If you consider that it's true that plaintiff has episodic bouts of depression rendering him unable to leave his house, feeling overwhelmed with the smallest tasks, and that these episodes may last for a week at least, is that something that would be consistent with either the jobs that you testified to in hypothetical number one or any other jobs in the national economy?

- 4 -

(Tr. 33).  Mr. McGowan testified that it would be obvious the claimant could not work anyplace. (Tr. 33).

### 3.  Post-Hearing Medical Records

The undersigned finds that the additional medical records, the Statement of Claimant or Other Person completed by Claimant's mother on March 9, 2010, treatment notes from the Family Medicine Clinic dated May 9 and June 4 and 25, 2008, Dr. Finder's letter dated October 8, 2008, psychological consultative evaluation completed by Dr. Finder on September 3, 2008, Medical Assessments of Ability to Do Work completed by Dr. Slaughter on November 5, 2008 and Dr. Parks on August 7, 2009, and the January 12, 2009 Initial Comprehensive Psychiatric Evaluation by Dr. Joseph Parks, submitted by Claimant after the hearing do not alter the outcome of this opinion.  (Tr. 210-46).  A review of the documents shows that some of the additional medical records submitted were duplicates of the Family Medicine Clinic notes already in the record before the ALJ[2]  Indeed, the undersigned notes that these records were part of the record before the Appeals Council prior to the Appeals Council finding no basis for changing the ALJ's decision and denying Claimant's request for review of the ALJ's decision.  (Tr. 1-5).  Thus, the undersigned finds that the additional medical evidence adds nothing new to the record regarding Claimant's alleged disability.

### III.    Medical and Other Records

In the Intake Assessment on March 31, 2004, Dr. Patrick Finder, a licensed psychologist, evaluated Claimant on referral by his mother.  (Tr. 134).  Dr. Finder observed Claimant to be neat

---

[2]The undersigned notes that some of the records submitted were duplicates of the records previously submitted to the ALJ at the time of the hearing.  See the treatment notes of June 4 and 25, 2008 (Tr. 201-05, 218-20, 221-24).

in appearance and dress and his affect very animated.  (Tr. 134).  Claimant reported blaming his

mood swings, his inability to function, to hold a job, and to maintain relationships on his substance

abuse, and others did the same.  (Tr. 134-35).  Claimant reported seeking treatment because his

girlfriend of six years could not take his behavior any more.  (Tr. 135).  Claimant reported his

alcohol use becoming heavy at 18 and started doing Crank.  The next ten years of his life

consisted of "major drug use and drinking."  (Tr. 135).  Claimant reported continued marijuana

use.  (Tr. 135).  Dr. Finder noted that Claimant jumped from topic to topic thereby making it

difficult to get a clear picture of functioning.  (Tr. 136).  In his diagnostic impressions, Dr. Finder

listed bipolar affective disorder, most recent episode mixed cannabis abuse and polysubstance

dependence.  Dr. Finder referred Claimant to a mental health agency, prescribed medication to

stabilize him, and enrolled him in a community psychiatric rehabilitation program.  (Tr. 136).

    In a letter dated August 18, 2006, an employee from Truman Medical Center Behavioral

Health apprised disability determinations that there are no records for the date of service

requested.  (Tr. 144).

    On August 28, 2006, on referral for a psychological consultation by Social Security

Disability, Claimant reported having taken medications in the past, and his parents reported that

he had been largely noncompliant with his medications.  (Tr. 146).  Dr. Aamoth noted Claimant to

be easygoing and friendly and found Claimant to be of at least average intelligence.  (Tr. 146-47).

Claimant reported his problems being with mood swings.  (Tr. 147).  Claimant started abusing

alcohol and marijuana as a teenager.  Claimant reported still using these substances as a form of

self-medication.  Because of a DUI, Claimant lost his license.  Claimant reported having many

friends but not being able to maintain any long-term relationship with the opposite sex.  Claimant

held a job with his father's company for one year.  Claimant lost all of his jobs because he fails to

go to work or because of hospitalizations.  (Tr. 147).  Dr. Aamoth assessed Claimant's GAF to be

50.  (Tr. 148).  Claimant reported being hospitalized as recently as six months earlier in a

psychotic state.  Claimant lives in an abandoned house next to his parents' house, and he is

renovating the house.  Claimant acknowledged he is medication noncompliant and agreed he

needs to follow through with recommendations.  Because Claimant does not pay bills, Dr.

Aamoth noted Claimant would need a payee.  Dr. Aamoth found his memory processes to

generally be good, and he comprehends both written and verbal instructions of a simple nature but

more complex instructions confuse him. Dr. Aamoth opined that Claimant is likely suffering from

a severe bipolar disorder that has been poorly regulated over the years.  (Tr. 148).

On September 1, 2006 on referral by the Missouri Department of Social Services, Dr.

Finder completed a psychological consultation.  (Tr. 149).  Dr. Finder noted that Claimant refused

to attend the first scheduled appointment.  Dr. Finder observed Claimant to present with a

significant pressure to his speech, and his affect to be animated and his mood euthymic.  (Tr.

149).  Claimant reported limited use of alcohol and marijuana.  (Tr. 150).  Claimant completed his

GED at age 15.  Dr. Finder noted that Claimant appeared as being above average in intelligence.

Claimant reported living in Kansas City most of his adult life, but he returned to Paris when things

became difficult for him.  (Tr. 150).  Claimant reported working in a variety of situations in

Kansas City and for his father and family friends.  (Tr. 150-51).  Claimant has of history of anger

on most of his jobs, and he is easily frustrated and has often said or done things in response to

remarks from his employers that have caused him to be fired.  (Tr. 151).  Claimant reported a

recent fight at his place of employment.  Claimant has been off medication for some time at the

time of the consultation.  The mental examination showed Claimant to have difficulty staying focused or following a line of thought through to a conclusion.  Claimant denied any feelings of depression at the time of the interview, but he noted his mood changed during the course of the interview.  Claimant has a website dedicated to his art.  (Tr. 152).  Dr. Finder noted that Claimant experienced some cognitive confusion.  Dr. Finder assessed his GAF to be 40.  (Tr. 152).  Dr. Finder noted that Claimant has only been marginally functional as an adult.  (Tr. 153).  Dr. Finder opined that "[a]t this point, Mr. Montgomery's illness appears to negatively impact every aspect of his life.  It is felt that there is no possibility that he will be able to hold down any type of employment without very intensive assistance.  He currently is not in any type of treatment in part because of the quality of care he received at the fee clinic and in part due to the very nature of his illness and the quick facilitation in mood and motivation that occur multiple times throughout the day."  (Tr. 153).

In the Psychiatric Review Technique dated September 15, 2006, Dr. Hutson found Claimant to have an affective disorder and substance addiction disorders.  (Tr. 154).  Dr. Hutson found his affective disorder to be bipolar I disorder.  (Tr. 156-57).  With respect to functional limitations, Dr. Hutson determined Claimant to have a moderate limitations in activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  (Tr. 162).  In support, Dr. Hutson noted that Claimant reported taking no medications, and his parents reported him being mostly noncompliant with medications.  (Tr. 164).  Dr. Hutson noted that Claimant has worked jobs but loses jobs, because he does not go to work consistently.  Dr. Hutson found his reported limitations to be credible, but he is expected to have improved stability of mood with treatment.  (Tr. 164).  In the Mental Residual Functional Capacity

Assessment, Dr. Hutson found Claimant to not be significantly limited in understanding and memory; to be moderately limited in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance; his ability to work in coordination with others; and his ability to complete a normal workday.  (Tr. 167-68). With respect to social interaction, Dr. Hutson found Claimant to be moderately limited in his ability to interact appropriately with the general public and his ability to get along with coworkers. (Tr. 168).  In the functional capacity assessment, Dr. Hutson noted as follows:

> Claimant has some work experience.  He is able to follow instructions and make work decisions.  He has untreated bipolar disorder and has periods of depression and low motivation.  His family reported problems with attendance and completing tasks.  These reports are credible.  Limitations appear to be moderate, and he is capable of working when he feels well.  With treatment he would be expected to have more stable functioning.

(Tr. 168).

On October 12, 2006, Dr. Hall completed a psychiatric evaluation at the Arthur Center. (Tr. 194).  Claimant reported having mood swings and needing something to help him maintain consistency.  (Tr. 194).  Dr. Hall noted Claimant to be alert and oriented and becoming extremely irritated with people.  (Tr. 195).  Dr. Hall assessed Claimant's GAF to be 46.  (Tr. 195).  Dr. Hall prescribed Depakote noting the Claimant reported Depakote helping in the past.  (Tr. 196).

In the Arthur Center progress note of November 14, 2006, Claimant reported Depakote helping with his mood swings but still being irritable and not getting a lot done.  (Tr. 185).  Dr. Hall prescribed Wellbutrin and Depakote. (Tr. 185).

In a letter addressed "To whom it may concern:" written by Dr. Hall, on November 14, 2006, the letter states:

- 9 -

I am writing to you in regards to David Montgomery (DOB 10/02/73).  Mr. Montgomery is a patient under my care for the treatment of bipolar disorder.  This condition has haunted his life since childhood and has dramatically affected his ability to maintain employment.  He has episodic bouts of depression which render him unable to leave his house, feeling overwhelmed with the smallest tasks, and thus incapacitated.  Such episodes are unpredictable and may last for a week or so, sorely testing the patience of even the most understanding employer.  I think this is a level of dysfunction, historically repeated in several different jobs, that does render him disabled in the sense of being unable to maintain gainful employment.

(Tr. 138).[3]

In the Arthur Center progress note of January 19, 2007, Claimant reported doing very well and hoping to return to therapy.  (Tr. 169, 186).  Dr. Hall increased the dosage of his Wellbutrin and Depakote medications.  (Tr. 169, 186).  In a follow-up visit, Claimant's mood was okay but he stopped taking Depakote.  (Tr. 170, 187).  Claimant indicated that he may pursue some schooling.  As treatment, Dr. Hall prescribed Wellbutrin and Seroquel.  (Tr. 170, 187).  Claimant reported having some normal bad moods and wanting to get back to work or back to school on June 19, 2007.   (Tr. 171, 188).  Claimant indicated that he would "like to hear on disability to be more confident of financial support."  (Tr. 171, 188).  Dr. Hall continued his medication regime.  (Tr. 171).  In a follow-up visit on August 14, 2007, Claimant reported being sleepy and having low mood and energy.  (Tr. 172, 189).  Dr. Hall increased his dosage of Wellbutrin and discontinued Seroquel and prescribed Ambien.  (Tr. 172, 189).

On October 23, 2007, Claimant reported the Wellbutrin medication helping.  (Tr. 190).  Dr. Hall continued his Wellbutrin medication.  (Tr. 190).  In a follow-up treatment on December 28, 2007, Claimant reported having some problems after forgetting to take his medications.  (Tr.

---

[3]A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the Commissioner to make the ultimate determination of disability.  House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

191).  Claimant reported problems getting out of bed.  Dr. Hall prescribed a trail of Lexapro.  (Tr. 191).

On February 18, 2008, Claimant reported no problems on Lexapro and the medication helping, but he experienced a setback when he forgot to take the Lexapro.  (Tr. 192).  Claimant reported having more drive and ambition.  Dr. Hall noted Claimant's mood to be better and prescribed Lexapro.  (Tr. 192).  In a follow-up visit on April 18, 2008, Claimant indicated Lexapro working well.  (Tr. 193).  Claimant noted that he hoped "once legal stuff is taken care of, I'll be able to get up and do things."  (Tr. 193).  Dr. Hall noted Claimant's mood to be better and continued the Lexapro medication.  (Tr. 193).

On May 9, 2008, Claimant received treatment at the Family Medicine Clinic.  (Tr. 198, 216).  Claimant needed his medications for depression to be refilled and reported being stable on Lexapro.  Dr. Miller noted the psychiatric review showed no anxiety and no depression.  (Tr. 198, 216).  Dr. Miller noted Claimant to be alert and oriented his mood and affect to be appropriate. (Tr. 199, 217).

On June 4, 2008, Dr. James Slaughter evaluated Claimant's mood disorder.  (Tr. 201, 218, 221).  Claimant reported a life-long history of problems with behavior.  Claimant noted that being on Lexapro has been beneficial in helping him to calm his mind and to help him focus somewhat better, but he still has difficulty with focus and concentration.  (Tr. 201, 218, 221). Claimant indicated that he continues to drink alcohol and smoke marijuana and smoking a package of cigarettes each day.  (Tr. 202, 219, 222).  With respect to his mental status, Dr. Slaughter observed Claimant to be alert and oriented but fidgety.  (Tr. 203, 219, 222).  Claimant described his mood as pretty good but before using Lexapro, he had significant depressive

symptoms.  Dr. Slaughter found Claimant to have a mood disorder not otherwise specified and

baseline ADHD.  Dr. Slaughter continued his Lexapro medication and prescribed Strattera.  (Tr.

203, 220, 223).  In the final report, Dr. Slaughter noted that Claimant continued to do quite well

on Lexapro as reported by Claimant.  (Tr. 205, 220, 223).  In the Family Medicine Clinic Note of

June 25, 2008, Claimant reported "that on Lexapro he continues to do quite well."  (Tr. 205,

224).  Dr. Slaughter observed Claimant to be smiling and friendly and having a calmer mind.  (Tr.

205, 224).  Because Claimant is a Medicaid patient, he no longer receives samples through the

Arthur Center.  Claimant asked if there was another medication equivalent to Lexapro.  Dr.

Slaughter explained that Celexa was the parent compound of Lexapro and anticipated an

increased dosage of Celexa could have the similar effect to the dosage of Lexapro.  In the

assessment, Dr. Slaughter opined that Claimant has a mood disorder, not otherwise specified,

now appearing that his may be major depression compounded by attention-deficit disorder with

hyperactivity.  (Tr. 205, 224).

On September 3, 2008, Dr. Finder completed a psychological evaluation on referral by the

Missouri Department of Social Services requesting assistance in determining ongoing eligibility of

benefits.  (Tr. 227).  Lexapro and Strattera were Claimant's current medications. With respect to

behavioral observations, Dr. Finder noted that Claimant arrived on time for the appointment,

appeared somewhat disheveled, and displayed extreme pressure to his speech.  (Tr. 227).

Claimant lived in Kansas City most of his adult life until three years earlier when he returned to

Paris to live with his parents.  (Tr. 229).  Claimant reported being unable to hold down any job for

very long, and anger cost him many jobs over the years.  Claimant is easily frustrated and often

says things in response to remarks from his employers leading to his termination.  (Tr. 229).  As

to his daily activities, Claimant reports that he really does not do anything.  (Tr. 230).  Claimant

goes for days forgetting to shower.  Claimant reported being nervous around people.  (Tr. 231).

Claimant has extreme problems with his memory.  Claimant described social isolation and not

wanting to be around people.  Dr. Finder noted how this information conflicted with the history

that he recounts for his past when he was very involved in the music scene in Kansas City and

promoting little known bands.  (Tr. 231).  Claimant constantly checks out things on the internet.

(Tr. 232).  Claimant indicated that if he is awarded Social Security benefits, he would receive a

large sum of money and possibly use the money to repay his parents, take a trip to Europe, to

develop a movie company, or to promote bands.  Dr. Finder observed Claimant to be oriented to

time, place and person.  (Tr. 232).  In the diagnostic impression, Dr. Finder listed Bipolar I

Disorder and assessed his GAF to be a 40.  (Tr. 233).  Dr. Finder noted that Claimant lost his jobs

due to his own changes in mood and behavior and because of his anger.  (Tr. 233).  Dr. Finder

opined that Claimant's illness appears to negatively impact every aspect of his life.  (Tr. 234).  Dr.

Finder concluded that there was no possible way Claimant could hold down a job at this time of

his life.  (Tr. 234).

In the October 8, 2008 letter in response to counsel's letter requesting additional

information on Claimant, Dr. Finder noted he first treated Claimant in March 2004.  (Tr. 225).

Claimant reported attempting to control his substance abuse for the last five years.  (Tr. 226).

Claimant spends most of his time in his room at his parents' house.  Dr. Finder opined that

Claimant's symptoms are still pronounced, and "I do not see how David would be able to obtain

or maintain any type of gainful employment."  (Tr. 226).

In the Medical Assessment of Ability to Do Work-Related Activities (Mental) completed

- 13 -

on November 5, 2008, Dr. Slaughter opined that Claimant has poor to none abilities to function independently, deal with work stresses, and maintain attention/concentration, and he could not assess whether Claimant could follow rules, relate to co-workers, deal with public, use judgment, or interact with supervisor.  (Tr. 236).  Dr. Slaughter found Claimant to have poor to none abilities to understand and complete job instructions and understand and carry out detailed job instructions.  (Tr. 237).  With respect to making personal-social adjustments, Dr. Slaughter opined that Claimant has poor to fair abilities to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability.  (Tr. 237).

On December 5, 2008, Claimant reported struggling with bipolar disorder for most of his life but only for the last year had he been treated.  (Tr. 242).  Claimant wanted to start counseling. He reported he stopped taking his medications, Lexapro and Stattera.  Dr. Sharon Carmignani referred Claimant to Peggy Brothers for medical management and counseling.  (Tr. 242).  In the Initial Comprehensive Psychiatric Evaluation completed on January 12, 2009, Claimant reported having periods of productivity where he had been able to maintain a girlfriend, own a house, and do business for several months but then everything falls apart on him.  (Tr. 243).  Claimant continues to use marijuana three times a day.  (Tr. 243).  Dr. Parks started Claimant on Abilify and directed Claimant to follow-up with counseling.  (Tr. 244).

In the Medical Assessment of Ability to Do Work-Related Activities (Mental) completed on August 7, 2009, Dr. Joseph Parks opined that Claimant has poor to none abilities to follow work rules, use judgment, interact with supervisor, deal with stresses, and maintain attention/concentration.  (Tr. 239).  Dr. Parks found Claimant to have poor to none abilities to understand and complete job instructions and understand and carry out detailed job instructions.

- 14 -

(Tr. 240). With respect to making personal-social adjustments, Dr. Parks opined that Claimant has poor to fair abilities to maintain personal appearance, to behave in an emotionally stable manner, and to demonstrate reliability. (Tr. 240).

In the Disability Report - Adult, Claimant's mother noted that Claimant misses a lot of work due to his depression resulting in his termination. (Tr. 82). Claimant stopped working on April 1, 2006 because "[h]e didn't call in to tell work he would not be there and his boss fired him." (Tr. 82).

In the Function Report Adult -Third Party, Claimant's mother reported Claimant's daily activities include eating, watching television, working on the computer, sleeping, and drawing. (Tr. 99, 103). His mother noted Claimant lives in a house with his parents. (Tr. 99). Claimant can clean, do the laundry, household repairs, iron, and mow except when he is depressed. (T. 101). His social activities include visiting with friends and family, and he does not have to be reminded to go places. (Tr. 103). Claimant's mother noted that Claimant is "very friendly and loves to talk." (Tr. 103). In the Function Report - Adult completed by his mother, Claimant indicated that he lives in an apartment alone. (Tr. 108). Going to work if he has a job was one of the daily activities listed. (Tr. 108). Claimant does grocery shopping. (Tr. 111). Computer and drawing are Claimant's hobbies, and he can draw for hours. (Tr. 112).

In the Disability Report - Appeal, Claimant's mother noted that Claimant has Medicaid. (Tr. 121, 124).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the insured status requirements of the Social Security

Act through June 30, 2011.  (Tr. 11).  The Claimant has not engaged in substantial gainful activity since April 1, 2006, the alleged onset date.  The ALJ found that Claimant has the severe impairment of bipolar disorder.  (Tr. 11).  The ALJ opined that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 12).  In finding Claimant's bipolar disorder was not a deemed-disabling impairment under the Commissioner's regulations, Listing 12.04 of Appendix 1, because his condition did not satisfy the "B" criteria of the listing in that his limitations were "skewed slightly by his lack of full compliance with his medications and a past history of polysubstance abuse."  (Tr. 12).  The ALJ opined that Claimant's limitations were only mild to moderate in the relevant functional areas, and there was evidence of episodes of decompensation.  (Tr. 12-13).  The ALJ further found that the record failed to establish the presence of the "C" criteria.  (Tr. 13).  After careful consideration of the entire record, the ALJ determined that Claimant has no exertional limitations and can understand, remember, and carry out at least simple instructions and non-detailed tasks, can respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent, and adapt to routine and simple work changes.  (Tr. 13).  The ALJ also found that Claimant is able to take appropriate precautions to avoid hazards.  (Tr. 13).  The ALJ determined Claimant is able to perform his past relevant work as a laborer as that work is generally performed.  (Tr. 17-18).  The ALJ concluded that Claimant has not been under a disability from April 1, 2006 through the date of the decision.  (Tr. 18).  Inasmuch as Claimant was not awarded a period of disability, disability insurance benefits, or supplemental security income benefits, the ALJ found no need to complete an assessment of whether polysubtance abuse is material to a finding of disability.  (Tr. 18).

- 16 -

**V.      Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment,

the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the

claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is

not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy.  In step five, the ALJ must consider the claimant's "age,

education, and past work experience."  Only if a claimant is found incapable of performing other

work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

      Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall, 274

F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

      In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

      1.     The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008)).  "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion."  Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)).  When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision.  Id.  The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly analyze the severity of Claimant's mental impairments.  Next, Claimant contends that the ALJ erred in finding that he can perform his past relevant work as a laborer.

A.      Sufficiency of the ALJ's Decision

Claimant is not disabled merely because he may have a mental impairment.  See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981).  The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520a.  This Regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment.  However, other considerations are included.  The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists.  20 C.F.R. § 1520a(b)(1).  These are gleaned from a mental status examination or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  20 C.F.R. § 404.1520a(b)(1).

In finding Claimant's bipolar disorder was not a deemed-disabling impairment under the Commissioner's regulations, Listing 12.04 of Appendix 1, because his condition did not satisfy the "B" criteria of the listing in that his limitations were "skewed slightly by his lack of full compliance with his medications and a past history of polysubstance abuse." (Tr. 12).  The ALJ opined that Claimant's limitations were only mild to moderate in the relevant functional areas, and there was evidence of episodes of decompensation.  (Tr. 12-13).  The ALJ further found that the record failed to establish the presence of the "C" criteria.  (Tr. 13).

- 20 -

An affective disorder, such as bipolar disorder, is presumptively disabling if "A" criteria and "B" criteria are met, or if "C" criteria are met.  "A" criteria (medical findings) are met if there is a medically documented persistence of a depressive, manic, or bipolar syndrome.  "B" criteria (functional limitations) are met if there is a marked[4] functional limitation in at least two of the following four categories : (1) daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) repeated episodes of decompensation, each of an extended duration.  "C" criteria are met if the disorder has been of at least two years duration with either (1) repeated episodes of decompensation, (2) such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) one or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. § 404, Pt. 404, Subpt. P. App. 1, Listing 12.04.  Repeated episodes of decompensation "means three episodes within one year, or an average of once every four months, each lasting for at least two weeks."  Id. at Listing 12.00(C)(4).  In making these findings, the ALJ's decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). " 20 C.F.R. §§ 404.1520a(e)(4).  The ALJ's decision also must "include a specific finding as to the degree of limitation in each of the functional areas described in 20 C.F.R. § 1520a(c)(3)."

Claimant argues that the ALJ should have found that he satisfied a listed impairment.

---

[4]The Commissioner defines a "marked" degree of limitation as more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree fo limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00C.

Claimant claims he suffers from bipolar disorder and that he meets the Listing 12.04A(3).  This

listing provides:

> 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes):
>
> AND
>
> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Claimant reported medications helping his symptoms.  See Medhaug v. Astrue, 578 F.3d 805, 813

(8th Cir. 2009). The ALJ concluded that in terms of mental functioning, Claimant had mild to

moderate limitations in the ability to perform basic work activities, social functioning, and

maintaining concentration, persistence, and pace and that he did not have a mental impairment or

combination of mental impairments which met or equaled a listed impairment.

In activities of daily living, the ALJ noted that record showed Claimant maintained a job as

laborer for nearly six years.  While Claimant alleged his impairments caused him to lose every job,

the ALJ found the records to be inconsistent and instead showed Claimant stopped going to the

jobs.  Claimant testified that he helped a lady friend by working on her farm.  In the Function

Report Adult - Third Party, Claimant's listed daily activities included  watching television,

working on the computer, drawing, cleaning, doing laundry and household repairs, going grocery

shopping, and visiting friends and family.  These activities support the ALJ's finding that his

activities of daily living were only moderately impaired.

- 22 -

Next, the ALJ found Claimant to have mild limitations in his social functioning. Social functioning includes the ability to get along with others (e.g. family members, neighborhood friends, classmates, teachers). 20 C.F.R. Pt. 404, Subpt. P, App. 1. In the Function Report Adult - Third Party, Claimant listed visiting family and friends as one of his social activities. Claimant's mother noted that Claimant is "very friendly and loves to talk." Indeed, Claimant reported to one doctor having a girlfriend for six years. Dr. Aamoth noted Claimant to be easygoing and friendly and that he has many friends. When examined by Dr. Slaughter in June 2008, he observed Claimant to be smiling and friendly and having a calmer mind. The ALJ noted Claimant not to have any significant difficulties in terms of social functioning at the hearing.

With respect to with difficulties in maintaining concentration, persistence, or pace, the ALJ opined Claimant's impairments would result in the most significant limitations. Due to these limitations, Dr. Finder found Claimant to have difficulty focusing and with judgment, understanding, remembering, carrying out complex job instructions, and maintaining attention and concentration. The ALJ noted Claimant not to be fully compliant with his medications. Nonetheless, Drs. Slaughter, Aamoth, and Hall found Claimant to have limitations in this area but not at the level of significance found by Dr. Finder. In the Function Report Adult - Third Party, Claimant's mother listed computer and drawing as his hobbies and noted he can draw for hours. At the hearing, Claimant testified that he can focus on art and sit down and draw for days on end. Likewise, the ALJ observed during the hearing, Claimant had the concentration, persistence, and pace to follow the proceedings of the hearing and effectively answer questions.

The ALJ found that there were no episodes of decompensation of any extended duration. Claimant does not dispute this finding.

- 23 -

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole.  "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo."  Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted).  "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits."  Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)).  Accordingly, the decision of the ALJ finding Claimant did not meet the listing requirements should be affirmed.

B.      Ability to Perform Past Relevant Work

Claimant contends that the ALJ erred in finding that he can perform his past relevant work as a laborer.

The ALJ's determination that Claimant can return to his  job as a laborer as generally performed.  (Tr. 17).  An ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as he actually performed it or as generally required by employers in the national economy.  Samons v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007) (citing Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)).  According to the Secretary's interpretation of past relevant work,

> [A] claimant will be found to be "not disabled" when it is determined that he or she retains the [residual functional capacity] to perform: 1. The actual functional demands and job duties of a particular past relevant job; or  2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

20 C.F.R. § 404.1520(e).  Section 404.1520 sets out a two part test.  If the claimant is able to perform under either prong of the test, the claimant is not disabled.  See Martin, 901 F.2d at 653

(holding that a claimant who cannot perform a particular past job may still be able to perform past relevant work under the second prong of the test).

An ALJ is required to make explicit findings of the actual physical and mental demands of the claimant's past relevant work and then must compare them with the claimant's RFC. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  The ALJ has the responsibility to obtain information concerning the work the claimant has done during the relevant period of time. See 20 C.F.R. § 404.1560(b)(2).  Sources of the information include, without limitation, vocational experts or specialists, the Dictionary of Occupational Titles ("DOT") and its companion volumes and supplements, published by the Department of Labor, as well as claimant's own description of his past relevant work. Id.  In a decision that the claimant can perform his past relevant job, the ALJ must explicitly describe the physical and mental demands of this job and decide whether claimant's RFC would permit him to return to this past work.

At the hearing, the ALJ asked the vocational expert to assume that Claimant has no physical restrictions; is able to understand, remember. and carry out as least simple instructions and non-detailed tasks; can respond appropriately to supervisors and co-workers in a task oriented setting, where contact with others is casual and infrequent; can adapt to routine, simple work changes, and can take appropriate precautions to avoid hazards when determining his ability to return to any past relevant work.  Accordingly, the hypothetical question constituted substantial evidence supporting the ALJ's decision inasmuch as the question precisely set forth Claimant's mental impairments found to be credible by the ALJ. Gragg . Astrue, 615 F.3d 932, 940 (8th Cir. 2010) ("The hypothetical question posed by the ALJ in this case incorporated each of the physical, mental and cognitive impairments that the ALJ found to be credible, and excluded

- 25 -

those impairments that were discredited or that were not supported by the evidence presented.").

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE


Dated this  _20th_   day of March, 2012.